## APPEAL OF HARRY C. MOORES.

Docket No. 4209.    Submitted September 24, 1925.    Decided January 14, 1926.

> The proceeds from the sale of stock of which the taxpayer had made an absolute and *bona fide* gift does not constitute income to him.

*John A. Kratz* and *E. M. Huggins, Esqs.*, for the taxpayer.
*A. Calder Mackay* and *Wm. Lauder, Esqs.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This appeal is from the determination of a deficiency in income tax in the amount of $10,065.11 for the calendar year 1920, arising from the inclusion by the Commissioner, as income to the taxpayer, of the difference between the selling price and the cost, or March 1, 1913, value, of 160 shares of common stock of the Moores & Ross

Milk Co., of which the taxpayer alleged he had made an absolute gift to his wife and two daughters three weeks before the sale was made.

### FINDINGS OF FACT

The Moores & Ross Milk Co. commenced business in June, 1903, as a partnership, composed of Harry C. Moores and one Ross, the capital of the partnership being about $700. They had in their employ Ross's sister, Miss Hester E. Ross, who married Harry C. Moores in December, 1903. After the marriage she continued to work for the partnership for about five months, and occasionally thereafter, for a period of five years, took the place of other employees when they were absent, working also considerably at nights without compensation. The partners were at that time leaving all of the earnings in the partnership, except a bare living in the business.

The business prospered, and in 1910 they incorporated under the name of the Moores & Ross Milk Co. A majority of the stock was owned by Moores and Ross, the remainder being held by employees and two persons not employed by the corporation. Both Moores and Ross devoted their entire time to the business, Moores having charge of the outside work, machinery, buildings, building operations, delivery, etc., and Ross of the office finances, bookkeeping, etc.

The business of the corporation grew rapidly, and the number of shares of stock was increased from time to time until 1920, when 1,250 shares of common and 620 shares of preferred stock were outstanding.

The secretary and third largest stockholder of the company, Frank A. Benua, a capitalist living in Columbus, Ohio, some time in January, 1920, read in one of the local papers that the Dollings Co., a corporation, was going into business in Columbus on a large scale. He forthwith telephoned to one Harrison, a representative of that company, and, upon receiving from him a verification of the statement in the newspaper, suggested that possibly the Dollings Co. might be interested in purchasing the Moores & Ross Milk Co. Benua and Harrison continued their conversations in this matter for some time, during which Benua mentioned it to Ross, but not to Moores. Benua furnished Harrison with a recent appraisement of the plant of the Moores & Ross Milk Co. and finally, at Harrison's request, called Moores and Ross into conference in the latter part of March, 1920. At this conference the three tentatively agreed among themselves that $461 per share was a fair price for the common stock of the Moores & Ross Milk Co. Benua thereupon wired this price to Harrison, who had left Columbus, but received no reply from him. Nothing further was heard from Harrison, and Benua made no further effort to communicate with him. On or

about April 17 or 18, he met Harrison on the street in Columbus. Harrison then told him that the price which he had mentioned was too high and that he could not consider it, suggesting, however, that Benua come to his office to discuss the matter further. On the night of April 18, 1920, Benua, Ross, and Moores met at Harrison's office, and, after some hours of negotiation, they agreed upon a price of $375 per share for the common stock and $105 per share for the preferred stock, provided that all of the outstanding stock of the Moores & Ross Milk Co. could be delivered. The matter was then referred to the individual stockholders, and on May 5, 1920, the sale of the stock was closed on the basis of $375 and $105 per share, respectively.

The taxpayer and his wife had discussed for several years the matter of his giving Mrs. Moores an interest in the business and of buying a residence. Each was in favor of both propositions, but they were unable to find a satisfactory residence at what they deemed a fair price. Taxpayer therefore delayed making the transfer of any of his stock to her. In January, 1920, the matter became active in his mind, and he definitely informed his wife and children of the fact that he would soon have transferred to them certain stock which he owned, and about the 1st of April, 1920, he directed the secretary of the company to cancel 160 shares of his common stock and issue certificates for 100 shares to his wife and 30 shares to each of his two children, aged 14 and 7 years, respectively. On April 14, 1920, the certificates were duly issued and delivered to the three donees.

The taxpayer made the transfers to his wife in recognition of her valuable services in helping to build up the business, and to his children for the purpose of providing a separate estate for them and of interesting them in business affairs, as well as to provide for them against any eventuality that might occur in the future. He also had in mind that if the business should be sold he would save a considerable amount which he would be required to pay as income tax in the event of a sale of the stock at a profit. Each individual's share of stock and the proceeds of the sale thereof have at all times been kept separate from each other and from all others, except that after the sale of the stock on May 5, 1920, the taxpayer and his wife purchased a lot and erected thereon a residence at a cost of some $44,000, which they hold as tenants in common and have occupied as their home since its completion in 1920, after paying practically one-half of the total cost. The taxpayer has managed all transactions for his wife and children, but has taken no action without first having obtained the consent of his wife. She has signed all checks for the payment from her funds and each of the donees has kept her funds in a separate bank account.

## DECISION.

The deficiency determined by the Commissioner is disallowed.

## OPINION.

LITTLETON : The Commissioner held that, inasmuch as the taxpayer transferred the stock to his wife and children shortly before and in anticipation of its sale at a profit for the purpose of avoiding tax on the profit realized, it resulted not in a gift to them of the stock but of the proceeds of the sale only. From the evidence submitted the Board is of the opinion that the taxpayer made a valid and *bona fide* gift of the stock, and not of the proceeds of the sale thereof, to his wife and two children. There is evidence that the taxpayer had in mind the fact that he would have to pay income tax on the increased value of his stock, as shown by the difference between the sales price and the cost or the fair market value on March 1, 1913. There is also evidence that he would not have consented to the sale of the stock at the price obtained had he thought that income tax would be payable on the amount received for the stock of which he had made a gift to his wife and children. In our opinion, however, the motives that impelled him to make the gift are immaterial. The gifts were absolute and were made prior to any agreement for the sale of the stock.

The certificates denoting the transfers were duly executed and handed to the assignees, and the shares of stock which were so transferred thereafter became their property. It is essential to the validity of a gift that there be a distinct delivery of property so as to show that the donor has relinquished all dominion over it. The donor went as far in this case as he could have gone, unless he had secured the appointment of a guardian or trustee to manage the property of his daughters. Naturally, he deemed such appointment unnecessary. He was their natural guardian, and his success in business might well have led him to believe that no other was necessary or desirable from any point of view. The appointment of a guardian or trustee would, to some extent at least, have deprived the children of the opportunity to learn how to transact business and to conserve the property. It would have been expensive and an unnecessary impoverishment of their property. The taxpayer's wife was an invalid and therefore prevented to a considerable degree from managing for the children. She and her husband, however, discussed investment and other disposition of their funds.

In the case of *Rote* v. *Warner*, 17 Oh. C. C. 360, the owner of two railroad bonds indorsed on each a statement in pencil that he gave them to his daughter M., with the date. M. was then 3 years old.

The bonds were placed in the custody of her mother, the donor's wife, until his death five years later. The delivery was held sufficient to establish a complete gift. On appeal the decision was affirmed. 57 Oh. St. 633. See also *Mook* v. *Savings & Loan Co.,* 87 Oh. St. 273; and *Walston* v. *McCabe,* 11 Oh. N. P. 26.

Under the evidence in this appeal, the Board is of the opinion that the Commissioner erred in holding that the gift by taxpayer to his wife and daughters was of the proceeds from the sale of stock and not of the stock. The gift took effect, at the latest, on April 14, 1920, at which time there had not been a sale of the stock, nor was it definitely known by this taxpayer, or anyone else, that the stock would be sold.

On reference to the Board, KORNER, JAMES, and TRAMMELL dissent.